**In re Andrew LAFRATTE and Mary LaFratte, Debtors.**

**The Luzerne National Bank, Plaintiff,**

**v.**

**Andrew LaFratte, Defendant.**

**Bankruptcy No. 5–99–01884.**

**Adversary No. 5–99–00140A.**

United States Bankruptcy Court, M.D. Pennsylvania, Wilkes–Barre Division.

May 29, 2002.

Charles A. Shea, III, Kingston, PA, for plaintiff.

Joseph G. Murray, Wilkes–Barre, PA, for defendant.

## *OPINION*

JOHN J. THOMAS, Bankruptcy Judge.

Andrew LaFratte is the sole stockholder and principal of L & L Processing, a manufacturer of rotary processing equipment. The business supplied specially ordered parts to various customers throughout the world. Because L & L did not have sufficient capital to advance expenses of manufacturing these parts, it entered into a Cash Flow Maximizer Agreement with a local financial institution, the Luzerne National Bank, hereinafter "LNB" or "Bank". (See Transcript of 11/27/2000 at 74 (Doc. # 17A).) Under the terms of that Agreement, account receivables would be sold to the Bank at their face amount less a reserve and a bank fee, and the customer would be instructed to direct payment to L & L at a lock box in custody of the Bank. Should the receivable not be paid in a timely fashion, the Bank would transfer the receivable back to L & L in return for

those funds that were theretofore advanced. The Debtor personally guaranteed the obligation. (Plaintiff's Exhibit No. 1.)

The initial line of credit advanced under these terms was in the amount of $350,000. By all accounts, the arrangement worked marvelously and the Bank was encouraged to repeat the process for a requested larger line in the amount of $600,000. It was then that the relationship deteriorated. It turned out that many of the "receivables" turned over by LaFratte to the Bank were not collectable and the Bank found itself with the line of credit extended to approximately $597,000 when L & L filed Chapter Seven bankruptcy. Shortly thereafter, LaFratte filed bankruptcy attempting to discharge his personal guarantee.

It was the personal bankruptcy that spawned the Bank's Complaint to Determine Dischargeability presently pending before me. The Bank alleges that LaFratte provided worthless invoices which were not truly receivables because, in only one of the identified transactions, was product manufactured and, in that case, it was said to be defective. The customers refused to pay L & L for goods that were not delivered. The Bank complains under 11 U.S.C. § 523(a)(2)(A) and § 523(a)(4). Shortly before trial, the Bank withdrew its Complaint under Section 523(a)(4). (Transcript of 11/14/2000 at 27 (Doc. # 15A).)

Three days of testimony were conducted on this matter during which the Debtor reaffirmed his understanding that all invoices were valid and collectable at the time they were presented to the Bank. He acknowledged that they were not capable of being collected at the time of trial because product was not delivered, with the exception of the one occasion when the customer argued the item was defective. LaFratte testified that he generally relied on telephonic orders from customers.

This was the way he had operated under the earlier line of credit with the Bank and everything went well. The Debtor, in inconsistent fashion, asserted that the customers agreed to pay L & L in advance of manufacturing the needed part, but, somehow, that obligation ceased when the Debtor did not produce the part. Little written backup for the orders was provided because, as implied by Debtor's counsel, it was not subpoenaed.

■ The Plaintiff alleges that the obligation should survive the bankruptcy discharge by reason of 11 U.S.C. § 523(a)(2)(A). That section reads:

§ 523. **Exceptions to discharge.**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; . . .

11 U.S.C. § 523(a)(2)(A)

In *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), the Supreme Court observed that terminology utilized in 11 U.S.C. § 523(a)(2)(A) incorporates the "general common law of torts." *Id.*, 516 U.S. at 71 n. 9, 116 S.Ct. at 444 n. 9. Furthermore, "the most widely accepted distillation of the common law of torts [is] the Restatement (Second) of Torts (1976)." *Id.*, 516 U.S. at 70, 116 S.Ct. at 443–444. That "distillation" can be found in Section 525 of the Restatement, Liability for Fraudulent Misrepresentation, which incorporates the following elements established

by the historical development of the common law in causes of action in deceit:

1. A false representation made by the defendant. In the ordinary case, this representation must be one of fact.

2. Knowledge or belief on the part of the defendant that the representation is false—or, what is regarded as equivalent, that he has not a sufficient basis of information to make it. This element often is given the technical name of "scienter."

3. An intention to induce the plaintiff to act or to refrain from action in reliance upon the misrepresentation.

4. Justifiable reliance·upon the representation on the part of the plaintiff, in taking action or refraining from it.

5. Damage to the plaintiff, resulting from such reliance. William L. Prosser, Handbook of the Law of Torts § 100 (3rd ed.1964).

Essential to the Plaintiff prevailing on this Complaint is meeting the burden of proving by a preponderance of the evidence that the Debtor made a false representation. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*In re Scocozzo*, 220 B.R. 850, 852 (Bankr. M.D.Pa.1998).

There is little dispute that the Bank has met its burden of establishing that the Debtor represented the invoices to be receivables. I find that the record is insufficient to find any of the invoices presented to the Bank would qualify under the Cash Flow Maximizer Agreement definition of account receivable, or, for that matter, under any common understanding of the term receivable. I make this finding notwithstanding LaFratte's testimony to the contrary. While this would make LaF-

ratte potentially liable for negligent misrepresentation as that tort is understood in the Restatement (Second) of Torts § 552 and applied in Pennsylvania (*J.E. Mamiye Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 615 (3d Cir.1987)), the Debtor's negligence is not at issue before me.

Moreover, LaFratte clearly intended the Bank to rely on his representation and, in doing so, the Bank transferred funds to L & L. The submission of these invoices, together with the Debtor's representation, allowed the Bank to "justifiably rely" on the representation without further research or review.[1]

As indicated, scienter is a necessary element of this cause of action. *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 442, 133 L.Ed.2d 351 (1995).

(T)he term "scienter" refers to a mental state embracing intent to deceive, manipulate, or defraud. In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381, n. 12, 47 L.Ed.2d 668 (1976)

In support of the Debtor's absence of scienter, testimony was proffered that all funds received from the Bank were deposited in the business; that Debtor's salary did not fluctuate from his modest $35,000 annual salary; and that the Debtor, during this time period, invested much of his personal funds into L & L to keep the business afloat. LaFratte argues that the Bank, having the burden of proof, has not shown the Debtor to have the necessary fraudulent intent or *scienter* needed for the obligation to survive discharge.

---

1. Note the difference between "justifiable" reliance and "reasonable" reliance spelled out in *Field v. Mans*, 516 U.S. 59, 70–71, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995).

■ Scienter is not limited to intentional false declarations. The subjective boundaries of scienter can best be demonstrated by reference to the Restatement (Second) of Torts § 526, *(Conditions under which misrepresentation is fraudulent (scienter))*.[2] More precisely, the parties' attention should be drawn to Restatement (Second) of Torts § 527 *(Ambiguous Representation)* :

A representation that the maker knows to be capable of two interpretations, one of which he knows to be false and the other true is fraudulent if it is made:

(a) with the intention that it be understood in the sense in which it is false, or

(b) without any belief or expectation as to how it will be understood, or

(c) with reckless indifference as to how it will be understood.

I find LaFratte understood the invoices he presented to LNB were potentially collectable accounts. Nevertheless, L & L, through it's principal, LaFratte, warranted and represented that the receivables were "bona fide and existing obligations of Customers ..." (Plaintiff's Exhibit 2, Paragraph 4.1), that arose from the delivery of goods or the rendering of services (*Id.* at Paragraph 4.2). Notwithstanding LaFratte's opinion of collectability, these invoices were not as represented. As LaFratte put it at the time of trial, there was no current obligation by the customer to L & L. Reading between the lines, while LaFratte was *under the impression* that some customers were obligated to advance sums to L & L, he *knew* that any financial obligation of the customer was dependent on ultimate delivery of product or services by L & L. He acknowledged as much when he repeatedly testified that there was no existing obligation by the customer to the estate at the time of trial. (Transcript of 11/15/00 at 47–48, 65, 84, 116, 136, 139–140, 141, (Doc. # 16A) and Transcript of 11/27/2000 at 80 (Doc. # 17A).) It is this material fact, i.e. the contingencies of collectability, that LaFratte neglected · to share with LNB prior to drawing down on L & L's line of credit.

■ Liability under 11 U.S.C. § 523(a)(2)(A) can be based on a "debtor's silence" in regards to a material fact. *In re Docteroff,* 133 F.3d 210, 216 (3d Cir. 1997). More precisely, the use of a term which is capable of multiple meanings and one of which is false, is sufficient to support an action of fraud. *General Motors Acceptance Corp. v. Central Nat. Bank of Mattoon,* 773 F.2d 771, 776 (C.A.7 (Ill.) 1985). The essential question before me is whether LaFratte's failure to provide further description to these invoices presented to LNB was merely negligent or reckless. *Luciani v. Bestor* (1982), 106 Ill. App.3d 878, 888, 62 Ill.Dec. 501, 436 N.E.2d 251 ("a representation which the maker believes to be true but because of negligent expression is in fact false is a negligent rather than fraudulent misrepresentation.") Several facts allow me to conclude that LaFratte's conduct reached reckless proportions. LaFratte cancelled at least two of the invoices submitted by L & L to the Bank because of lack of funding despite the fact that LNB advanced sufficient funds on those invoices to have per-

**2.** § 526. CONDITIONS UNDER WHICH MISREPRESENTATION IS FRAUDULENT (SCIENTER)

A misrepresentation is fraudulent if the maker

(a) knows or believes that the matter is not as he represents it to be,

(b) does not have the confidence in the accuracy of his representation that he states or implies, or

(c) knows that he does not have the basis for his representation that he states or implies.

mitted manufacture of the part. (Transcript of 11/15/2000 at 119–121 (Doc. # 16A).) Moreover, after acknowledging an awareness that the Country of Indonesia was going through a period of unrest which rendered uncollectible a pending order, shortly thereafter LaFratte submitted an invoice from an Indonesian customer to LNB for an advance without warning the Bank of such instability. (Transcript of 11/15/2000 at 90 (Doc. # 16A).) Without explanation to the Bank, LaFratte's invoices bore "ship dates" that had no basis in fact but were mere estimates of delivery times. (Transcript of 11/27/2000 at 33–34, 58, 73 (Doc. # 17A).) No efforts to secure written confirmations of oral purchase orders were attempted. LaFratte made minimal effort to collect on these receivables despite his observation that they evidenced true obligations of customers. (Transcript of 11/15/2000 at 66 and 98 (Doc. # 16A).)

I am satisfied that LaFratte's failure to fully disclose to LNB the contingent nature of these so-called "receivables" went beyond mere negligent conduct and showed a reckless disregard for the real value of these telephonic customer orders. I find that LaFratte was completely indifferent as to how LNB would view the collectability of these invoices, and he used that to his advantage by drawing down on the line of credit to near it's maximum limits. For all these reasons, I find in favor of LNB and against the Debtor, concluding that the debt owing the Plaintiff is nondischargeable.